J-A04019-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: D.A.G., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: K.A.R., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1457 MDA 2024 |

Appeal from the Decree Entered September 9, 2024
In the Court of Common Pleas of Huntingdon County Orphans' Court at
No(s): 2024-00011

BEFORE: LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED APRIL 15, 2025**

K.A.R. (Mother) appeals from the decree[1] terminating her parental rights to D.A.G. (Child).[2,3] Mother's counsel, Lance T. Marshall, Esq. (Counsel) has filed an application for leave to withdraw and an ***Anders***/***Santiago***[4] brief. After review, we grant Counsel's application to withdraw and affirm.

---

[1] The decree was dated September 5, 2024, and it was served on the parties and entered on the docket on September 9, 2024. **See** Pa.R.A.P. 108(a)(1) (providing that the date of entry of an order is the day the clerk of court mails or delivers copies of the order to the parties); Pa.O.C.R. 4.6.

[2] Child was born in April of 2018, and was six years old at the time of the termination hearing on September 5, 2024.

[3] Father's parental rights were terminated the same day as Mother's. Father is not a party to this appeal.

[4] ***Anders v. California***, 386 U.S. 738 (1967); ***Commonwealth v. Santiago***, 978 A.2d 349 (Pa. 2009); ***see also In re V.E.***, 611 A.2d 1267, 1275 (Pa.
*(Footnote Continued Next Page)*

The trial court provided a thorough review of the facts in this matter:

Briefly, Mother is the natural mother of [Child]. [Child's] natural father is [Father]. [Father] has never played a role in [Child's] life, and [Father's] parental rights were terminated via a separate decree entered in this matter concurrently with the decree [in the instant case.] The Huntingdon County Children & Youth Services Agency (CYS) has been involved with Mother and [Child] for approximately one-third of [Child's] life; [Child] is now six years old, and he was declared dependent on August 26, 2022, when he was four years old. Findings of Fact at ¶9; N.T., Termination Hearing, May 15, 2024 ("First Hearing"), at 29-30. [Child's] current placement began on January 18, 2023, and has continued through the current date.

The court notes that due in part to difficulties in serving [F]ather and questions as to whether [F]ather is, indeed, [Child's] natural father, along with motions made by Mother's counsel, two hearings were held in this matter. The first hearing was held on May 15, 2024. The second was held on September 5, 2024. Mother appeared at the first hearing but not at the second hearing.

Mother has a criminal history involving convictions for controlled substances offenses and theft. . . . Pertinent here, Mother was arrested and detained in July 2022 for [probation and parole violations] . . . just prior to [Child] being declared dependent and undergoing his first placement. The violations were apparently related to Mother testing positive for methamphetamine, and thus CYS's initial concerns were that Mother was not available to care for [Child] due to her involvement in the criminal justice system and Mother's drug use. N.T., First Hearing, at 28-30. CYS had also previously attempted to screen Mother for drug use on multiple occasions, and Mother refused to cooperate. *Id.* at 28.

[Child] had been returned to Mother's care when CYS Caseworker Christi Shawley was assigned to the matter on October 3, 2022. Ms. Shawley has remained [Child's] caseworker since that time. *Id.* On December 22, 2022, Mother was again arrested and

_____

Super. 1992) (extending *Anders* to appeals involving the termination of parental rights).

detained for probation violations . . . . At that time [Child] was removed from Mother's care due to her unavailability and placed with his great-grandparents. That placement was temporary, as [Child's] great-grandmother lives in an age-restricted housing community. On January 18, 2023, just prior to Mother again being released from incarceration, [Child] was placed in foster care with [foster mother and foster father]. He has remained in their care since that time. *Id.* at 29-30.

CYS's stated primary concerns have always been Mother's drug use and housing instability. But there are also significant concerns with her parenting skills, here inability to form a positive attachment with [Child], and what can only be characterized as a marked refusal to comply with authorities.

Mother's continuing interactions with the criminal justice system led to her being arrested yet again in September 2023 for probation violations . . . , and her probation in that case being revoked in October 2023. Upon revocation, she was resentenced to another period of three years' probation.

In the period between Ms. Shawley being assigned to [Child's] case in October 2022 and the filing of the petition to terminate Mother's parental rights [(TPR petition)] in March 2024, Mother has changed her "official" residence five times. Her current "official" residence is at her mother's home in Altoona, which is also occupied by her brother. The court uses the term "official" because there is a reasonable inference that Mother changes her residence quite often and has not provided that information to CYS. Ms. Shawley noted that during visits to Mother's current address in Altoona, she would often observe Mother's belongings there, but Mother was absent. On some occasions Mother would instead be staying at a friend's house in Altoona; on others, Mother simply could not be found. *Id.* at 39-40.

Due to her move to Altoona, supervision of Mother's probation has been transferred to Blair County. During Mother's supervision by Huntingdon County, information provided to Ms. Shawley indicated that probation officers regularly struggled to make contact with her. Mother is currently not working (though she has applied for jobs). *Id.*

Drug testing of Mother has been a struggle. CYS has tested, or attempted to test, Mother on 89 occasions. Of those, 19 were either positive or occasions on which she could not produce a sample (which are treated as positives). She refused to provide

a sample on 23 occasions. On 27 occasions, Mother was not home and could not be found. Finally, on 20 occasions, Mother tested positive only for her prescribed medications. *Id.* at 32. These were a mixture of announced and unannounced tests and included ones that Mother knew were to be conducted as a condition of supervised visits with [Child]. *Id.* at 35. The last positive test was on January 22, 2024, for a supervised visit. Mother tested positive for buprenorphine and amphetamines. Ms. Shawley was unable to confirm whether this was the result of prescribed substances because Mother has not provided updated prescription information to CYS. Notably, this was not just the result of a drug screen, but a confirmed laboratory test. *Id.* at 33. Also notable was a prior positive result for buprenorphine on October 16, 2023. Again, as Mother had not provided CYS with updated prescription information, it is not known if there was a legitimate reason for this result. But more concerning is that the laboratory results indicated that Mother may have attempted to provide an adulterated or false sample. "The creatinine and [n]itrate levels were off . . . [.] The results from the lab was her urine the creatinine level was not consistent with normal human urine." *Id.* at 41.

Turning to Mother's refusal to comply with authorities, Ms. Shawley summed this up well early in her testimony. "Just the way that [Mother] interacts with providers and myself. She's often very agitated. She does not cooperate, refuses to sign documents, refuses to drug test, shows up late or not at all." *Id.* at 32. Mother was referred to Mainstream Counseling for parenting education and drug and alcohol counseling. Mother did complete the parenting program, but did not attend sessions consistently. As for drug and alcohol counseling, Mainstream's recommendation was that Mother participate in an intensive outpatient program, but Mother declined; Mainstream's counselor relayed that "[Mother] had made the comment that she's only going to do what Probation requires her to do," which was bi-weekly sessions as opposed to weekly sessions. Even then, Mother's attend[ance] at drug and alcohol treatment sessions was inconsistent, and she has not completed the program. *Id.* at 33-34.

Mother has had supervised visits with [Child], but has never been able to transition to unsupervised visits. The visits began in January of 2023, and between that date and when the TPR petition was filed in March 2024, Mother only completed 16 visits with [Child]. Many times Mother simply did not show up for scheduled

- 4 -

visits; for others, she was late, or would refuse to drug test. Between June 8th and October 16th of 2023, Mother attended no visits. Mother also had difficulty complying with the rules for visits. On two occasions she gave [Child] written notes; one time she slipped the note into his pocket, and on the other she placed it in a Happy Meal bag that was sent home with him. She made multiple comments and allegations about the foster home and foster parents that were upsetting to [Child]. And, despite being given two opportunities to review and sign the visitation contract that she was expected to sign with the supervised visitation service provider, Mother outright refused to read or sign it, telling the service providers "I ain't signing shit." *Id.* at 35-37, 42.

The issues with Mother's lack of compliance with authorities, overall negative attitude, and angry outbursts were also noted by Maddie Sell. Ms. Sell is a licensed professional counselor who performed an attachment and bonding assessment regarding Mother and [Child]. She testified as an expert at the first termination hearing. With regard to Mother, Ms. Sell performed a Test of General Reasoning Ability, Adverse Childhood Experiences Scale, Trauma and Attachment Belief Scale, Child Abuse Potential Inventory, and Personality Assessment Inventory. Mother's score was average on the Test of General Reasoning Ability, meaning she had the capacity to understand the questions that would be asked on the other assessments and would not need assistance with completing them. On the ACES Mother's score was a 6 out of 10; anything over a 3 is significant and indicates that the person has had traumatic childhood experiences that may impact their ability to form positive attachments with their children and parent their children in a positive manner. On the TABS, which assesses how a person views themselves and view others, all but one of Mother's scores was either clinically significant or elevated, and one was extremely low. Mother's overall TABS profile shows that she has limited self-awareness and a lot of traumatic stress, which can lead to a "disorganized" or "fearful-avoidant" attachment style. The CAPI profile for Mother not only resulted in an abuse score that well exceeds the cutoff for a high potential for abuse, but also elevated scores in the lie and inconsistency scales. This again indicates that Mother was trying to manipulate the results so that they would appear more positive; per Ms. Sell, it can reasonably be assumed that "the scores actually would have been higher had [Mother] not attempted to manipulate the scores." As for the PAI, the results of this assessment for Mother were probably the most notable of all of the ones that were conducted.

[I]t was an odd clinical profile. There was definitely signs that there was some downplaying of certain issues but then some over exaggeration of other issues, showed some presence of traumatic stress, paranoid and antisocial traits, emotional lability, hostility, difficulties with anger management, history of antisocial behavior and again that disorganized fearful avoidance attachment was present there as well. And that particular attachment style is the most uncommon one and it results from a person feeling unsafe where the parent is a source of fear for them. So it can cause some anxious behaviors in relationships but also avoidant so that sort of push/pull, sometimes we call it I hate you/don't leave me. Like I said, definitely it's the most uncommon one and it is—it's—it can create some significant attachment disruptions in the person's life.

*Id.* at 8-10.

Ms. Sell had the same level of difficulty in contacting, setting appointments with, and conducting appointments with Mother that were noted by Ms. Shawley and various service providers. Mother attended two appointments with Ms. Sell; one on February 10, 2023, and one on February 24, 2023. But Mother was referred to Ms. Sell four months prior to that, and it took that long for Mother to finally be able to set the appointments in coordination with Ms. Sell's office. Ms. Sell attempted to conduct a third appointment with Mother, as there were additional assessments that she wanted to perform in order to be able to hone her results, but this was not completed. There were multiple attempts to schedule and conduct this third appointment with Mother over a six-month period, and Mother cancelled or no-showed five or six times. After Ms. Sell told Mother that if she cancelled or no-showed for one more appointment, Ms. Sell would have to complete her report without the additional information, Mother scheduled an appointment for August 21, 2023. *Id.* at 10-11.

The events of August 21, 2023, are particularly significant in this case because what occurred was not only directly witnessed by Ms. Sell, but both confirmed the results of the assessments she performed on Mother and corroborated the reports of Mother's behavior from other service providers.

Per Ms. Sell, her office has a policy that if a person is more than ten minutes late for an appointment, it is considered a no-show. Mother had been informed of this many times. The appointment

was scheduled for 4:00 pm. At 3:59 pm Mother attempted to call Ms. Sell, but Ms. Sell missed it because her phone was on silent. At 4:02 pm Mother texted Ms. Sell to tell her "I'll be there in a few." Remembering all of the prior difficulties and experiences she had had with Mother, and anticipating the sort of excuse Mother might attempt to use to avoid having her late arrival counted as a no-show, Ms. Sell stepped out of her office to wait and see when Mother actually arrived. Ms. Sell noted that the building her office is in is rather small, the door to her office is off a hallway that leads to the waiting room, and the bathroom door is off the same hallway, directly across from her office. In other words, there was no way that Mother could have come into the building in a way that Ms. Sell would not have seen her arrive. Ms. Sell waited in the hallway until 4:20 pm, at which time she sent Mother a text message telling her that she was now 20 minutes late, and the appointment would be counted as a no-show. [Ms. Sell] then returned to her office. At approximately 4:25 pm she heard Mother come into the building and walk past her office, at which time she received a text message from Mother claiming that she had been there waiting the entire time. Ms. Sell did not go out and engage with Mother until she heard Mother yelling in the waiting room, as Mother was apparently on the phone with another service provider who was working on her case and was upset about Ms. Sell deeming the appointment a no-show.

> [Mother] was very argumentative with me when I asked her to leave. We have other therapists in that office. We can't have that sort of disruption in there and, you know, argued back and forth. Eventually she did go to leave and as she walked past me[,] she postured toward me but then said, you're lucky I don't put my hands on you and then left. So that was the extent of that. An[d] so all of that in the testing, although I was unable to observe a visit between her and [Child], just seeing that behavior kind of play out before my eyes really solidified what the testing showed.

*Id.* at 11-13, 24-25.

Ms. Sell's overall assessment is that there was love present between [Child] and Mother, but that this love is not enough to overcome Mother's inability to foster a secure attachment with [Child] and lack of emotional resources to provide for [Child's] emotional needs. In essence, Mother is unable to set aside her own needs and desires in order to take actions that are in [Child's]

- 7 -

best interests. This is not the result of intentional selfishness on the part of Mother, but rather an inability to even acknowledge that the problem lies with her, instead of others. *Id.* at 16-17, 26-27. Ms. Sell gave the example of the fact that during their February 10, 2023[] appointment, Mother admitted to her that she refused to drug test for supervised visits on principle, despite knowing that such refusal would prevent her from being able to have visitation with [Child]. This lack of ability to put [Child's] needs first is emblematic of the unhealthy attachment between Mother and [Child], because if the attachment between a parent and child is secure and healthy, the parent would "do anything to make sure [they] had that visit. [They] certainly would not refuse the drug test on principle." *Id.* at 13-14. Ms. Sell further noted that while therapy could help Mother overcome her many issues and past traumas, such therapy would take a long time and would require a level of engagement from Mother that Mother is currently incapable of.

> [W]e're talking years of therapy if she were engaged in it, if she felt that she needed it. I've not seen anything that's indicated to me that she would be engaged. Like I said, it's as though she doesn't seem to think that she has those issues that she needs to work on.

*Id.* at 26.

With specific respect to the bond between Mother and [Child], Ms. Sell explained that this is very different than attachment. "Attachment is an emotional connection that is developed between a child and a caretaker. Whereas a bond is something that we can develop at any point in our lives." *Id.* at 17. A bond can develop from shared interests; something as simple as a shared experience or shared interest in a particular sport. An attachment is much more. Mother and [Child] share a bond, but not a secure, positive attachment. *Id.* at 17-18.

Ms. Sell noted that the negative attachment between [Child] and Mother caused many mental health concerns for [Child], and that these concerns would continue for as long as he continues to have a relationship with Mother. Her conclusion and recommendation from her assessment of Mother was that in order to "safeguard [Child] from experiencing further psychological trauma and to protect his well-being it is imperative he not return to [Mother's] care." *Id.* at 25-26. Continuing the relationship between Mother

and [Child] "creates a situation [for Child] that's indefensible." **Id.** at 17.

Per Ms. Shawley, [Child] has been doing quite well in foster care. He sees a therapist twice a week to address his mental health issues and also receives services in school. He does have "rough days," but many of these coincide with supervised visits. He struggles if a visit is scheduled and then does not occur. He struggles if Mother says something at a visit that upsets or troubles him. But outside of these issues, he has a strong and healthy attachment with his foster parents. He's excited to get home from school each day and tell his foster mother what he has done in school; he enjoys helping her cook and helping her care for her grandson when he's in the home. The foster parents monitor and take care of [Child's] medical needs. And they have indicated that they are willing to continue caring for [Child]. **Id.** at 37, 38.

Trial Ct. Op., 10/28/24, at 1-10 (footnotes omitted and formatting altered).

On September 9, 2024, the trial court entered a final decree terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8).[5] **See** Decree, 9/9/24.[6] Mother filed a timely appeal and statement of errors complained of

---

[5] We note that children are entitled to counsel in a contested termination of parental rights. **See In re T.S.**, 192 A.3d 1080, 1082 (Pa. 2018) (citing 23 Pa.C.S. § 2313(a) (providing that children have a statutory right to counsel in contested involuntary termination proceedings). It is well settled that "a single attorney cannot represent a child's best interests and legal interests if those interests conflict." **In re Adoption of K.M.G.**, 240 A.3d 1218, 1236 (Pa. 2020) (citing **T.S.**, 192 A3d at 1082). Here, the record reflects that Andrea L. Lehman, Esq. was appointed as Child's GAL, and the trial court also appointed separate counsel, Nick Newfield, Esq., to represent Child's legal interests. **See** Order, 5/17/24; N.T., 9/5/24, at 3.

[6] The trial court did not include in its decree that it was terminating Mother's parental rights under Section 2511(b). However, there was no objection to this omission from the decree, and the trial court explained that it terminated Mother's parental rights under both Section 2511(a) and (b). Trial Ct. Op., 10/28/24, at 10-12. Further, although the decree did not specifically cite to

*(Footnote Continued Next Page)*

on appeal. *See* Pa.R.A.P. 1925(a)(2)(i), (b). In her Rule 1925(b) statement, Mother raised a single issue: "Did the trial court abuse its discretion and fail to consider the best interests of [C]hild by terminating the parental rights of [] Mother?" Rule 1925(b) statement, 10/4/24.

In the ***Anders***/***Santiago*** brief, Counsel identifies the following issues:

1. The trial court stated "beyond a reasonable doubt that termination is in [Child's] best interest."

2. The trial court used, in its opinion, evidence that was not admitted in trial. Specifically, at page 11 and in footnote 7 [of the trial court's opinion], the trial court refers to a "letter" written to the Court by . . . Mother on "October 2, 2024."

3. The trial court's refusal to require an additional attachment assessment.

***Anders***/***Santiago*** Brief at 18-20 (citations omitted and some formatting altered).

---

23 Pa.C.S. § 2511(b), the decree did state that "termination of parental rights of [Mother] would best serve the needs and welfare of [C]hild." Decree, 9/9/24, at 3 (unpaginated). We conclude that the decree terminated Mother's parental rights under both Section 2511(a) and (b). ***See In re Adoption of C.S.S.***, 407 WDA 2019, 2019 WL 4034313, at *8 (Pa. Super. filed Aug. 27, 2019) (unpublished mem.) (concluding that although the trial court did not cite Section 2511(b), by stating that "[t]h[e trial c]ourt further finds that terminating the parental rights best serves the development, physical and emotional needs and welfare of the child[,]" the decree terminated the appellant's parental rights under both Section 2511(a) and (b), and that "the trial court's oversight in its written decree [did not] preclude [this Court] from reaching the merits of [the appellant's] appeal"); ***see also*** Pa.R.A.P. 126(b) (stating this Court may rely on unpublished decisions of this Court filed after May 1, 2019, for their persuasive value).

- 10 -

Although not explicitly raised in Mother's Rule 1925(b) statement, we conclude that Mother's last two issues identified in the ***Anders***/***Santiago*** brief essentially challenge the trial court's best interests analysis pursuant to 23 Pa.C.S. § 2511(b), that we will include as part of our disposition concerning Child's best interest, therefore we decline to find waiver.[7]  However, we find that Mother's Rule 1925(b) statement fails to raise any issues concerning Section 2511(a).  ***See*** Rule 1925(b) Statement, 10/4/24.  Further, Counsel conceded that the sole non-frivolous issue raised in the ***Anders***/***Santiago*** brief was Mother's challenge to the trial court's "best interests" analysis pursuant to 23 Pa.C.S. § 2511(b), and that Mother "implicitly admits that CYS has established grounds for termination under § 2511(a)." ***Anders***/***Santiago*** Brief at 13 (citing Trial Ct. Op., 10/28/24, at 10).  Accordingly, we conclude that any challenge under Section 2511(a) was not preserved and is waived on appeal.  ***See Anders***/***Santiago*** Brief at 13; ***Dietrich v. Dietrich***, 923 A.2d 461, 463 (Pa. Super. 2007) (stating that issues not raised in the Rule 1925(b) statement are waived on appeal).

When faced with an ***Anders***/***Santiago*** brief, this Court may not review the merits of any possible underlying issues without first examining counsel's

---

[7] "Under Pa.R.A.P. 2116(a), a '[1925(b)] statement will be deemed to include every subsidiary question fairly comprised therein . . . or fairly suggested thereby.'" ***FedEx Corporate Svcs., Inc. v. Costume Gallery, Inc.***, 320 A.3d 129, 135 (Pa. Super. 2024).

- 11 -

request to withdraw. *See In re X.J.*, 105 A.3d 1, 3 (Pa. Super. 2014). As this Court has stated:

> To withdraw pursuant to *Anders*, counsel must:
>
>> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the [*Anders*] brief to the [appellant]; and 3) advise the [appellant] that he or she has the right to retain private counsel or raise additional arguments that the [appellant] deems worthy of the court's attention.
>
>> With respect to the third requirement of *Anders*, that counsel inform the appellant of his or her rights in light of counsel's withdrawal, this Court has held that counsel must "attach to their petition to withdraw a copy of the letter sent to their client advising him or her of their rights."

*In re J.D.H.*, 171 A.3d 903, 907 (Pa. Super. 2017) (citations and quotation marks omitted).

Additionally, counsel must file a brief that meets the following requirements established by the Pennsylvania Supreme Court in *Santiago*:

> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

*X.J.*, 105 A.3d at 3-4 (quoting *Santiago*, 978 A.2d at 361).

"Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the trial court's proceedings and

render an independent judgment as to whether the appeal is, in fact, wholly frivolous." *Id.* at 4 (citations omitted). Our independent review is not limited to the issue(s) discussed by counsel, but extends to "additional, non-frivolous issues" that may have been overlooked by counsel. *J.D.H.*, 171 A.3d at 908 (citation omitted). An appeal is frivolous when it "lacks any basis in law or fact." *Santiago*, 978 A.2d at 356 (citation omitted). Further, under *Anders*, "[a]n issue that is waived is frivolous." *Commonwealth v. Tukhi*, 149 A.3d 881, 888 (Pa. Super. 2016) (citation omitted).

Instantly, Counsel has filed an application for leave to withdraw which states that he conscientiously reviewed the record and determined that the appeal is frivolous. He has also provided this Court with a certificate of service demonstrating that he served Mother with a copy of his *Anders*/*Santiago* brief, application for leave to withdraw, and a letter advising Mother of her right to retain new counsel or proceed *pro se* or and the right to raise any additional points that Mother deemed worthy of consideration. Additionally, Counsel's *Anders*/*Santiago* brief provides a summary of the essential facts and procedural history of the case. Counsel also sets forth his reasons for concluding that Mother's appeal is frivolous. For these reasons, we conclude that Counsel has substantially complied with the technical requirements set forth above, and we proceed to an independent review of Counsel's assessment that the appeal is frivolous because there was sufficient evidence to terminate Mother's parental rights. *See X.J.*, 105 A.3d at 4.

Our standard of review in this context is as follows:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. When applying this standard, the appellate court must accept the trial court's findings of fact and credibility determinations if they are supported by the record. Where the trial court's factual findings are supported by the evidence, an appellate court may not disturb the trial court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result. Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, a trial court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support. Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

*In re M.E.*, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations omitted and

some formatting altered).

Termination of parental rights is governed by § 2511 of the Adoption Act[, 23 Pa.C.S. §§ 2101-2938]. Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination. In evaluating whether the petitioner proved grounds under § 2511(a), the trial court must focus on the parent's conduct and

- 14 -

avoid using a balancing or best interest approach. If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under § 2511(b), which focuses on the child's needs and welfare. *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).

*Id.* at 830 (some citations omitted and some formatting altered); *see also In re Q.R.D.*, 214 A.3d 233 239 (Pa. Super. 2019) (explaining that if "the court determines the parent's conduct warrants termination of his or her parental rights, the court then engages in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child" (citation omitted and formatting altered)). We note that we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

### Section 2511(a)(8)

Section 2511(a)(8) provides as follows:

**(a) General Rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

- 15 -

23 Pa.C.S. § 2511(a)(8).

In order to satisfy Section 2511(a)(8), the petitioner must prove that: (1) the child has been removed from the parent's care for at least twelve months; (2) the conditions which led to the removal or placement still exist; and (3) termination of parental rights would best serve the needs and welfare of the child. *See In re Adoption of J.N.M.*, 177 A.3d 937, 943 (Pa. Super. 2018). Our inquiry is focused on whether "the conditions which **led** to the removal or placement . . . **continue** to exist." *In re R.R.D.*, 300 A.3d 1077, 1082 (Pa. Super. 2023) (citation omitted and emphases in original).

Here, the record reflects that Child has been in foster care since January 18, 2023, and Mother's failure to address her issues concerning substance abuse disorder, refusal to cooperate with drug testing, and lack of stable housing have not been remedied. *See* N.T., 5/15/24, at 29-32. Despite numerous attempts by CYS, Mother continues to refuse testing, has missed appointments, and has failed to improve the conditions that led to Child's placement. *See id.* at 33. Ms. Christi Shawley, a CYS caseworker testified that the conditions that led to Child's placement have not been remedied. *See id.* Additionally, she testified that termination would best serve the needs and welfare of Child. Further, Ms. Sell, the licensed professional counselor who performed the attachment and bonding assessment, testified that in order to safeguard Child from experiencing more psychological trauma and to protect Child's well-being, it is imperative that Child not return to Mother's care. *See id.* at 25-26. Additionally, Ms. Sell testified that there are no indications that

Mother would be able to remedy her own issues and look out for Child's best interests. *See id.* at 26-27. Child has been with foster parents since January 18, 2023, and is thriving, and shows love and affection towards foster parents and finds comfort with them. *See id.* at 38; *see also* Trial Ct. Op., 10/28/24, at 1-10.

Further, in the decree terminating Mother's parental rights, the trial court made the following findings of fact and conclusions of law:

FINDINGS OF FACT

1. [Mother] . . . is the natural mother of [Child].

2. [Mother] was properly served with the involuntary termination of parental rights petition and accompanying documents via hand delivery at Huntingdon County Children's Services. [Mother] did attend the termination of parental rights hearing on May 15th, 2024.

3. [Mother] was properly served with a continuance order for the involuntary termination of parental rights hearing scheduled for September 5, 2024 by hand delivery at Huntingdon County Children's Services Office. . . . [Mother] did not attend the termination of parental rights hearing on September 5, 2024.

4. Caseworker, Christi Shawley, testified that [Mother] has failed to maintain consistent visitation and consistent contact with [Child] since [Child] was placed [in foster care] on January 18, 2023.

5. Caseworker, Christi Shawley, testified that [Mother] failed to comply with or follow through with court ordered services and failed to make progress towards reunification with [Child].

6. Maddie Sell testified to the fact that a parenting assessment could not be completed with [Mother] due to [Mother] cancelling her appointments and not showing for scheduled appointments.

7. [Mother] has not engaged with any of the services offered by [CYS], nor has she demonstrated a commitment to parenting

- 17 -

[Child] or addressing the concerns that led to [Child's] removal and placement.

8. [Mother] has not made any progress towards alleviating the circumstances that necessitated the original placement.

9. [Child] was declared a dependent child on August 26, 2022.

10. [Child] was placed by court order on January 18, 2023.

11. The court heard evidence that [Child] is in [a foster home with foster parents] who provide[] a loving, caring, and nurturing relationship with [Child]. [Child] treats [foster parents] as though they are his parents, and [Child] is bonded with them.

12. The court was presented with additional evidence affirming that [foster parents] adequately address[] [Child's] medical and educational requirements.

CONCLUSIONS OF LAW

1. The court was presented with sufficient factual evidence/information to support the involuntary termination of parental rights pursuant to 23 Pa. C.S. § 2511(a)(8).

2. Specifically, [Child] was removed from [Mother's] care on January 18, 2023. At all times since that date, [Child] has remained in the care of [CYS] and the foster home . . . .

3. The services or assistance reasonably available to [Mother] are not likely to remedy the conditions which led to the removal and placement of [Child] within a reasonable period of time.

4. The conditions which have led to the removal and placement of [Child] continue to exist, and termination of parental rights of [Mother] would best serve the needs and welfare of [Child].

5. [Foster parents] have indicated their willingness to provide care for [Child].

6. Accordingly, the termination of parental rights is appropriate based upon 23 Pa.C.S. § 2511(a)(8).

Decree, 9/9/24, at 1-3 (some formatting altered). We conclude that the trial court's conclusions are supported by the record, and we agree with its decision

- 18 -

terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8). **See id.**; **see also** Trial Ct. Op., 10/28/24, at 1-10.

## Section 2511(b)

Counsel's **Anders**/**Santiago** brief has identified three issues related to Mother's challenge to the trial court's best interest of Child analysis raised in her Rule 1925(b) statement.

We review the trial court's conclusion that involuntarily terminating Mother's parental rights best serves Child's developmental, emotional, and physical needs and welfare pursuant to Section 2511(b).

Section 2511(b) states:

> **(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(b).

> This Court has explained:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

>> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort,

security, and stability the child might have with the foster parent. Additionally, . . . the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa. Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)), *abrogated in part on other grounds by* *In re K.T.*, 296 A.3d 1085 (Pa. 2023).

Our Supreme Court has stated that "if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which 'is not always an easy task.'" *K.T.*, 296 A.3d at 1106 (quoting *T.S.M.*, 71 A.3d at 267). In *K.T.*, our Supreme Court explained that "a court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." *Id.* at 1113. Indeed, the *K.T.* Court emphasized that "the parental bond is but one part of the overall subsection (b) analysis, which includes a determination of whether the bond is necessary and beneficial to the child, *i.e.*, whether maintaining the bond serves the child's developmental, physical, and emotional needs and welfare." *Id.*

Courts must consider "the child's need for permanency and length of time in foster care[;] whether the child is in a pre-adoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical and emotional needs, including intangible needs of love, comfort, security, safety, and stability." *Id.* (footnote omitted and formatting altered).

In weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***T.S.M.***, 71 A.3d at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id.***

Here, the trial court explained:

Ms. Sell's statement during her testimony that forcing [Child] to maintain a relationship with Mother "creates a situation . . . that's indefensible" is probably the best summation of this case. For a laundry list of reasons Mother is simply incapable of placing [Child's] basic and essential needs ahead of her own wants and desires. Her focus is entirely on herself. Not once over the course of this termination matter or the underlying dependency matter has Mother showed concern for how this situation has affected [Child]. Instead, her arguments and her constant battles have always been about how CYS and others have treated her. She has displayed not even an iota of empathy toward [Child].

The undersigned judge has, unfortunately, presided over many dependency and termination of parental rights cases over the years. It has been his experience that a majority of the parents involved in such matters will at some point express, whether with sincerity or as an attempt to tell him what they think he wants to hear, concern for the effect that removal and placement has had on their children. A fair number of them realize, whether or not they want to admit it, that their parental shortcomings have negatively impacted their children. But not Mother. And that is both the key issue and true tragedy here.

Under the applicable law, termination is in the best interests of a child where the parent-child bond does not represent a relationship that is "necessary and beneficial" to the child. ***In re K.T.***, 296 A.3d at 1109. The situation in this case goes well beyond that. The record shows that the relationship between Mother and [Child] is detrimental and harmful to [Child]. This is not the sort of case in which it is merely apt to observe, as has been stated may times by the courts of this Commonwealth, that "a child's life simply cannot be put on hold in the hope that the

- 21 -

parent will summon the ability to handle the responsibilities of parenting." *In re A.K.*, 936 A.2d [528,] 533 [(Pa. Super. 2007)] (internal quotation omitted). Here, Mother actively refuses to develop that ability, as she sees no need for it.

[Child] is doing quite well now in foster care. However, this is only after receiving not only the benefit of that loving and supporting environment, but also intensive services from a therapist and other service providers. Mother wants to undo all of that work and create further harm for [Child] by having him returned to her care. As it is beyond a reasonable doubt that termination is in [Child's] best interests, such a result should not be permitted.

Trial Ct. Op., 10/28/24, at 11-12 (footnote omitted formatting altered).

The first issue identified in the *Anders*/*Santiago* brief is that the trial court applied an incorrect standard. The *Anders*/*Santiago* brief asserts that the trial court applied a "reasonable doubt" analysis as opposed to the appropriate "clear and convincing" standard. *See Anders*/*Santiago* Brief at 18. After review, we conclude that no relief is due. First, we note that the trial court cited *K.T.* for the legal standard applicable to termination of parental rights. *See* Trial Ct. Op., 10/28/24, at 10-11. In *K.T.*, our Supreme Court clearly stated: "the party seeking termination must prove 'by **clear and convincing evidence** the existence of the statutory grounds for doing so,' including that termination would best serve the child's needs and welfare pursuant Section 2511(b), in addition to termination grounds under subsection (a)." *K.T.*, 296 A.3d at 1105 (citation omitted and emphasis added). Accordingly, we conclude that the trial court applied the proper "clear and convincing" standard and not "beyond a reasonable doubt." Moreover, reasonable doubt is a higher standard than clear and convincing. *See In re*

*Estate of Greenwood*, 587 A.2d 749, 754 n.4 (Pa. Super. 1991) (stating that "[t]he clear and convincing standard of proof is higher than a preponderance of the evidence, but it is less than the requirement of establishing proof beyond a reasonable doubt").  As such, we discern no prejudice even if the trial court applied the reasonable doubt standard.  Further, upon review, it appears that the trial court utilized the words "beyond a reasonable doubt" to emphasize that, in its opinion, even under a standard higher than clear and convincing evidence, the record supported termination of Mother's parental rights.  For these reasons, we cannot conclude that Mother is entitled to relief merely because the trial court used the words "beyond a reasonable" doubt.  The trial carefully addressed and weighed the evidence in making its determination, and we conclude that this issue is frivolous.

Secondly, the **Anders**/**Santiago** brief argues that the trial court cited evidence that was not admitted at trial in its Rule 1925(a) opinion.  **See Anders**/**Santiago** Brief at 19.  Specifically, Mother states that on page eleven of the trial court's opinion, the trial court refers to a "letter" written to the trial court by Mother on October 2, 2024, and this letter was never admitted into evidence.  **See id.**  After review, we conclude that this issue is frivolous.  Although the letter from Mother was not admitted into evidence, there is other properly introduced evidence supporting the trial court's decision to terminate Mother's parental rights.  The trial court's reference to Mother's letter was

used as an example of Mother blaming CYS but expressing no direct concern for Child's wellbeing. *See* Trial Ct. Op., 10/28/24, at 11 n.7.

Here, the trial court summarized, there was ample additional evidence to support the trial court's conclusion that termination of Mother's parental rights was in the best interests of Child. *See id.* at 11-12. The record supports the trial court's conclusion that Mother is unable to prioritize Child's basic needs over her own wants and desires, and that Mother showed no concern Child's well-being throughout the dependency and termination proceedings. *See id.*, *see also* N.T., 5/14/24, at 11-13. Ms. Sell, who conducted the attachment and bonding assessment, testified that Mother's focus is on how she perceives she is treated by others, especially CYS, rather than addressing the impact of the proceedings and situation on Child. *See* N.T., 5/14/24, at 13. Ms. Sell testified that Mother's refusal to submit a drug test in order to receive supervised visits with Child, despite knowing that refusal would prevent visitation, is an example of Mother's inability to care for Child's needs. *See* N.T., 5/14/24, at 13-14. Ms. Shawley, a CYS caseworker, testified that Child struggles with the detrimental emotional effects of supervised visits with Mother. *See id.* at 37. Ms. Shawley testified that Child is doing well in foster care, receiving therapy and school services, and forming a strong bond with his foster parents, who are committed to continuing his care, and concluded that in order to ensure Child's wellbeing, it was necessary to sever the relationship between Mother and Child. *See id.* at 38-39. Further, Ms. Sell testified that the attachment and bonding assessment

supports the conclusion that in order to protect Child from further psychological harm, Child should not return to Mother's care. ***See id.*** at 25. Accordingly, even without considering Mother's letter that the trial court references, there is ample evidence on this record that the trial court's determinations were in the best interest of Child.

Thirdly, the ***Anders***/***Santiago*** brief asserts that the trial court refused to require a second attachment assessment beyond the assessment conducted by Ms. Sell. ***See Anders***/***Santiago*** Brief at 20. However, Mother fails to indicate how this was an error of law or an abuse of discretion. Indeed, Counsel states that he found no authority requiring a second attachment assessment, and Counsel concedes that he "is unable to think of a good reason to require a second attachment assessment." ***Id.*** at 20. Here, the record reflects that an attachment assessment was conducted by Ms. Sell, and she concluded that the ability to maintain and foster a secure attachment between Mother and Child is not present. ***See*** N.T., 5/14/24, at 18. Ms. Sell further testified that in order to protect Child's wellbeing, it was imperative that Child not return to Mother's care. ***See id.*** at 25. As Counsel noted, we can uncover no applicable legal authority that requires a second assessment when the parent is dissatisfied with the first assessment. ***See Anders***/***Santiago*** Brief at 20. After review, we conclude that this issue is frivolous.

For these reasons, we discern no error of law or abuse of discretion in the trial court's decree terminating Mother's parental rights. ***See M.E.***, 283 A.3d at 829-30. Further, the record reflects that Child is doing well in foster

care, and Child's foster home is meeting Child's developmental, physical, and emotional needs, including the intangible needs of love, comfort, security, safety, and stability. *See* N.T., 5/14/24, at 37-38; *K.T.*, 296 A.3d at 1113. Following our review of the record, we discern no abuse of discretion by the trial court in concluding that termination of Mother's parental rights would best serve Children's developmental, physical, and emotional needs and welfare, and that termination was in the best interests of Child. *See K.T.*, 296 A.3d at 1113; *M.E.*, 283 A.3d at 829-30.

Additionally, we have conducted an independent review of the record and conclude that Mother's appeal is frivolous and that Counsel has not overlooked any additional, non-frivolous issues.

For these reasons, we grant Counsel's petition to withdraw, affirm the decree terminating Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(8) and (b).

Decree affirmed. Counsel's petition to withdraw is granted. Jurisdiction relinquished.

Judgment Entered.

_____
Benjamin D. Kohler, Esq.
Prothonotary

Date: <u>04/15/2025</u>

- 26 -